CONTINUATION OF APPLICATION FOR SEARCH WARRANT

1. I, Daniel L. Olson, am a Special Agent for the Federal Bureau of Investigation and have been so employed for 20 years. I am currently assigned to the FBI Detroit Division, Traverse City Resident Agency. In this capacity, I investigate violations of federal statutes, including interstate threats as prohibited by Title 18 of the U.S. Code. I am thus a "federal law enforcement officer," as defined by Federal Rule of Criminal Procedure 41(a)(2)(C), and I am authorized to apply for and execute warrants issued by federal courts. During my employment as a Special Agent, I have investigated a wide range of federal criminal violations, including public corruption, organized crime and racketeering, drug trafficking, counterterrorism, enticement of minors for sexual activity, and possession and/or distribution of child pornography, and sexual abuse of minors, and I have conducted numerous searches of electronic devices. Prior to becoming an FBI Special Agent, I was employed as an Assistant United States Attorney in the Northern District of Illinois, Western Division, for 5 years. As a Special Agent and Assistant United States Attorney, I received training on the use of the Internet, computers, and digital devices as it relates to how these are used by individuals to facilitate illegal activity. I have also consulted with other Special Agents who specialize in computer and Internet related crimes to gain knowledge of common practices, techniques, and methods, as well as specialized knowledge of conducting searches of computers, digital devices, and electronic service providers.

2. I make this Continuation in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

3. This Continuation is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4. The property to be searched is a black Apple iPhone in a black case, model unknown, hereinafter the "Device." The Device is currently located at the FBI Traverse City Resident Agency office located at 10850 E. Traverse Highway, Suite 5500, Traverse City, Michigan.

5. The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6. On May 5, 2023, Preston Scott Mikottis was charged in a criminal complaint in the U.S. District Court of the Western District of Michigan, Southern Division, with one count of willfully making a threat or maliciously conveying false information through the use of an instrument of interstate commerce to kill, injure or intimidate a individual or unlawfully damage a building by means of an explosive, in violation of 18 U.S.C. Section 844(e), and one count of making a threat against the President of the United States, in violation of 18 U.S.C. Section 871(a). On May 12, 2023, Mikottis was arrested by FBI agents at a residence in Mather, California pursuant to the federal arrest warrant. Mikottis was located on a bed in the residence and taken into custody. On the same bed, a black Apple iPhone, the Device, was observed by the arresting agents. The Device had a message visible on the screen that read "Not speaking till I see an NCIS officer." The Device was seized and has remained in FBI control and custody. The Device is currently located in the FBI Traverse City Resident Agency office.

7.     On May 23, 2023, Mikottis was indicted in the Western District of Michigan, Southern Division, with three counts of using a telephone to make a bomb threat, in violation of 18 U.S.C. Section 844(e), and one count of making a threat to the President of the United States, in violation of 18 U.S.C. Section 871(a).  Based on the following, I believe the Device holds electronically stored information which is evidence of these crimes, as well as evidence of stalking in violation of 18 U.S.C. Section 2261A.

**January 29, 2023 Bomb Threat to the Corner Bistro**

8.     On January 29, 2023, at approximately 8:35AM, the Corner Bistro, a restaurant located at 102 N. Bridge Street, Bellaire, Michigan, situated in the Western District of Michigan, Southern Division, received a text message from telephone number 530-288-7473.  The text read:

"I planted a bomb at the restaurant"

"[T.S.'s first name] needs to answer the phone"

"It's on one hell of a time delay"

"Bent ima go to his house"

"Bet* never"

"Bet ima go to his house next."

9.     The text message further referenced the name of a child of one of the co-owners of the restaurant and stated:

"I wonder how [child name redacted] is doing"

"Ima see real soon"

"You know one of the reasons why I lost my children is because CPS said I wasn't going to be able to protect them from my ex wife."

10. On February 3, 2023, I interviewed a co-owner of the Corner Bistro. The co-owner stated that after her restaurant received this text message, employees notified law enforcement, and members of the Bellaire Police Department responded to the restaurant. After receiving this bomb threat, the Corner Bistro then received numerous telephone calls from an individual named Preston. Preston called four to five times per minute, tying up the business telephone, and he demanded to speak with T.S., who is a co-owner of the business. After demanding to speak with T.S., Preston hung up and called again repeatedly. When an employee attempted to hand the phone to T.S., Preston would not talk to him and simply hung up. During the repeated calls, Preston told one employee who answered that he was going to "add you to the list." T.S. knew Preston to be the former boyfriend of a mutual friend. Preston has harassed T.S. in the past by continually calling his personal cell phone.

11. The co-owner further stated that after the bomb threat was received, the Corner Bistro received numerous telephone calls from Preston for a period of a week. Preston appeared to use a calling application which changed the originating number. The calls significantly disrupted the business, preventing customers from being able to reach the business to make reservations and place take-out orders. The business resorted to instructing customers to text their orders. The bomb threat and repeated phone calls also disrupted their workforce, and the restaurant manager was scared to report to work. The co-owner provided copies of screenshots of text messages received from telephone number 530-288-7473. The screenshots contained the bomb threat described above. In addition, one of the messages on January 29, 2023 at 10:50AM read: "Must suck for business having ur lines tied up." The business also received text messages from 510-617-2914. Screenshots of text messages from this telephone number contained the following message:

"I told you I don't need the phone answered.  Now the bitch shut his phone off.  He's a pussy"

"I'll just keep calling you [C.O.'s first name] mom and her work till the truth is told"

"Wi-Fi calling apps are amazing"

"Maybe I'll look up online and find ur personal number too."

"I've got ur name"

"Its really easy"

"How else u think I go all these numbers.  Even [C.O.'s first name] moms.  Even my exs too."

"Tell [T.S.'s first name] to turn his phone back on so I can stop calling you"

"Or is he just going to continue to be a pussy."

12.     On February 13, 2023, I interviewed T.S..  T.S. was acquainted with Preston Mikottis.  Mikottis previously dated a mutual friend named C.O..  After C.O. left Mikottis, she lived with T.S. and T.S.'s girlfriend, B.S..  C.O. also obtained a Personal Protection Order again Mikottis.  After C.O. left the state of Michigan last year, Mikottis began harassing T.S. and B.S. in an attempt to learn of C.O.'s location.  In January 2023, Mikottis called T.S. again to ask about C.O..  Mikottis continued to call T.S., which eventually escalated into Mikottis making a bomb threat to T.S.'s business, the Corner Bistro.  T.S. was forced to close the restaurant on January 29, 2023, due to the bomb threat.  Mikottis has communicated with T.S. via Facebook messenger in the past, and Mikottis has used a variety of Facebook accounts.

13.     On February 16, 2023, I met with T.S. to obtain photos of call logs and other records of contact with Mikottis.  T.S. identified one of the Facebook accounts used by Mikottis to have the screen name of "Tommy Savage."

14.     I identified telephone number 530-288-7473, which was used to convey the bomb threat, to be a VOIP (Voice of Internet Protocol) telephone number serviced by TextNow, a telecommunications provider.  Records obtained from this service provider for this telephone number revealed it was assigned to account username "mikottisp" and a registered email address of mikottisp@gmail.com.  Text message transactional logs revealed that this account was used to text T.S. on January 29, 2023.  The account was also used to text the Corner Bistro 15 times on January 29, 2023.  The first text sent to the Corner Bistro matched the time the Corner Bistro received the bomb threat.  Outbound call activity for this account revealed that was used to contact T.S. and the Corner Bistro numerous times beginning on January 29, 2023.  Outbound call activity also revealed it was used to contact D.B., the mother of C.O., multiple times and a telephone number associated with A.B., the father of C.O., multiple times.

15.     I identified telephone number 510-617-2914, which was also used to contact the Corner Bistro and T.S., to be a VOIP number serviced by TextMe, a telecommunications provider.  Records obtained for this number from TextMe revealed it was assigned to user account ID number 25710460.  The customer populated email address for this account user ID was "tommysavage9386@gsmil.com," which was a non-verified email address provided by the customer.  This user was assigned telephone number 510-617-2914 on January 29, 2023.  Text message transactional logs for this account revealed that this number was used to contact the business telephone number of the Corner Bistro approximately 83 times between February 1, 2023, and February 3, 2023.  This number was also used to text a telephone number utilized by D.B., who is the mother of C.O..  Outbound call activity for this account revealed that it was used to contact D.B. three times on January 29, 2023, and ten times on February 2, 2023.

Outbound call activity also revealed it was used to contact T.S. six times on January 29, 2023, and over 80 times to contact the Corner Bistro between February 1, 2023 and February 3, 2023.

### April 27, 2023 Threat Call to Pennington County Sheriff's Office, South Dakota

16.     On April 27, 2023, the Pennington County Sheriff's Office in South Dakota received a telephone call from telephone number 279-336-2706 at approximately 6:38AM wherein the male caller stated, "you may want to evacuate" and then hung up.  Law enforcement officers from this department were dispatched to search the area surrounding their office and other buildings, including the federal building, for suspicious individuals.  The Pennington County Sheriff's Office was then contacted by a 911 dispatcher in Michigan, who advised that Preston Mikottis communicated with Detective Chad Aniszko of the Greenville Department of Public Safety that Mikottis had called in a threat to the Pennington County Sheriff's Office.

17.     On May 3, 2023, I spoke with Sgt. Amanda Swanson of the Pennington County Sheriff's Office concerning this incident and obtained copies of the incident reports.  These reports contained the following additional information:

- a. Detective Aniszko received numerous text messages from Preston Mikottis, who was utilizing telephone number 279-336-2706.  Detective Aniszko has had ongoing contact with Mikottis concerning separate investigations involving Mikottis.  In those text messages, Mikottis stated:

"Just told central dispatch in rapid city South Dakota where my ex is hiding with my son that they might want to evacuate"

"[C.O.]"

"Not at central dispatch is she hiding. But with her parents in South Dakota"

"I wonder what would happen if I tried to "swat" my ex's address. Think maybe someone would take me seriously"

"Iv called in now 3-4 bomb threats and not one fucking response"

"In the past 2 plus years"

"2 of em on a federal installation. It not like my phone has changed"

b. In February of 2023, the Greenville Department of Public Safety in Michigan was overwhelmed with denial of service attacks originating from Mikottis which entailed over 3000 calls in an 18 hour period. Detective Aniszko thereafter received daily communication from Mikottis after Detective Aniszko attempted to communicate with Mikottis to cease. Since then, Mikottis has been sending Detective Aniszko pictures of male genitalia on a daily basis and other messages.

c. The Pennington County Sheriff's Office arranged for a welfare check to be conducted of C.O. as a result of this information.

**April 28, 2023 Bomb Threat to the Corner Bistro**

18. On April 28, 2023, at approximately 6:30PM, the Corner Bistro received a text message from telephone number 279-336-2706 which read:

"might want to evacuate. I placed a bomb on the premises"

"[T.S.] better check his family"

19. On May 1, 2023, I interviewed T.S., who reported this incident to me and the Antrim County Sheriff's Office immediately after the text was received. T.S. believed the text originated from Mikottis, as the user of this telephone also texted screenshots of information from one of Mikottis' Facebook profiles. The screenshots displayed chats from a group entitled "Child Porn Addicts." This same screenshot was displayed on Mikottis' Facebook page. At the

time the bomb threat was received, the Corner Bistro was full of customers. The Antrim County Sheriff's Office responded to the Corner Bistro and documented the threat. T.S. and the Antrim County Sheriff's Office provided me with screenshots of the texts received, including the bomb threat described above.

### Prohibited Contact with Family of C.O.

20. On February 6, 2023, I interviewed C.O.. C.O. was formerly in a relationship with Preston Mikottis while they lived together in East Jordan, Michigan. C.O. ended their relationship and obtained a Personal Protection Order against Mikottis before she moved out of the state of Michigan. Since obtaining that order, Mikottis has been attempting to locate C.O.. Recently, Mikottis began contacting C.O.'s mother, D.B.. Mikottis repeatedly called D.B. over 500 times in just a period of two days. Mikottis also called C.O.'s former workplace on February 3, 2023 over 200 times. C.O. stated that Mikottis has determined where her parents live in South Dakota. Mikottis called D.B. and stated their address, and then said "does it mean anything to you?" Mikottis used numerous telephone numbers from which to contact D.B.. Mikottis spoke with D.B. and A.B., C.O.'s parents, during which he stated he wanted to speak with C.O. about the child. C.O. has a son by Mikottis, who was born after she left Mikottis.

21. C.O. further stated that Mikottis was familiar with B.S. and B.S.' boyfriend, T.S.. C.O. lived with B.S. and T.S. after she left Mikottis. C.O. stated that Mikottis knew T.S. worked at the Corner Bistro in Bellaire, Michigan.

22. On February 7, 2023, I interviewed D.B.. D.B. stated that Preston Mikottis has been contacting her in order to speak with her daughter, C.O.. Mikottis left a voice mail on one occasion stating "does [their former South Dakota address] mean anything?" On February 3, 2023, Mikottis left another voice mail in which he stated their current address in South Dakota,

followed by "does that mean anything to you, well it should." This is the current address where C.O. resides with her parents. D.B. stated that her husband has also received calls at his workplace from Mikottis.

### Other Harassment by Mikottis

23. On February 3, 2023, I received information from U.S. Secret Service Special Agent Austin Hunt. Hunt reported that over the last year, he has received hundreds of emails and text messages from Mikottis. The communications were of an irrational nature. Hunt previously interviewed Mikottis in a separate matter described further in this Continuation, and Mikottis obtained Agent Hunt's contact information from that previous interaction.

24. On February 7, 2023, I received information from Michigan State Police Trooper Steven Schutter. Trooper Schutter provided reports concerning several other instances of Preston Mikottis engaging in harassing contact with individuals. In one matter, Mikottis harassed a Child Protective Services employee in Michigan by emailing her multiple times a day since the beginning of November 2022. In those emails, Mikottis admitted to physical abuse of his step-daughter.

25. Trooper Schutter provided reports concerning a separate matter wherein Mikottis sent pictures of his male genitalia to a minor and sent lewd messages to the parents of the minor in Michigan. The mother of the minor had been acquainted with Mikottis in a professional capacity while Mikottis lived in Veterans Affairs home in the Gaylord, Michigan area in 2022. In August 2022, Mikottis began messaging the mother of the minor victim from various Facebook accounts. The messages were a lewd nature toward her and her daughter. The mother attempted to block Mikottis from communicating with her, but he continued contact with her by

creating a new accounts to message her from.  Mikottis then began emailing affiliates with her business.

26.     On April 7, 2023, I obtained police reports from the Kalkaska County Sheriff's Office concerning Preston Mikottis.  Those reports reflected that a Personal Protection Order against Mikottis was obtained on March 10, 2022, protecting C.O., with an expiration date of March 10, 2024.  On October 4, 2022, B.S. reported to the Kalkaska County Sheriff's Office that Preston Mikottis contacted her over Facebook Messenger.  Mikottis was looking for her friend (C.O.).  B.S. advised Mikottis to cease contact with B.S..  Mikottis then repeatedly messaged her as well as commented on one of her Facebook pictures "Ur Restarted step son is going to grow up without parents."  B.S. felt threatened by this statement and was staying with her parents because of the threat.  In a follow up contact, B.S. provided two Facebook profiles from which Mikottis was using to contact her.  One profile name was "Pee Miko" and the other was "Tommy Savage."  Attempts to locate and interview Mikottis by the Kalkaska County Sheriff's office were unsuccessful.

**November 5, 2021 Bomb Threats and Threats to Kill POTUS**

27.     On November 5, 2021, starting at approximately 8:37AM, Preston Mikottis called the FBI Detroit main telephone number making claims that he planted a bomb at Camp Pendleton in California and stating that he lived at 3513 Scofield Road, East Jordan, MI 49727.  During the call, Mikottis identified himself as USMC PFC Mikottis and provided the last four digits of his social security number.  Mikottis asked the FBI personnel who answered the call whether he had a pen and paper.  Mikottis spelled his full name and requested to have a USMC officer over to his house.  Mikottis then stated "I planted a bomb at Camp Pendleton, California." Mikottis stated that he was currently located at the address in East Jordan, Michigan, described

above. Mikottis then repeated that he "planted a bomb at Camp Pendleton, California." Mikottis further stated his cell phone has been hacked and continued to repeat his name and request a USMC officer to come to his residence. Mikottis shouted profanity and eventually hung up.

28. On November 5, 2021, at approximately 8:39AM, 8:45AM, and 8:47AM, Mikottis continued to call the FBI Detroit main telephone number. In each call, Mikottis identified himself, repeated the bomb threats, and shouted profanity. Mikottis continued to demand a USMC officer to come to his door. Each of these described telephone calls were recorded and I have listened to each recording.

29. On November 5, 2021, at approximately 4:07PM, Mikottis called the FBI Detroit main telephone number and again identified himself, after which he stated: "I plan on killing the President and I planted bombs all over East Jordan, Michigan." Mikottis continued to demand a USMC officer to come to his door. Mikottis provided his name and last four digits of his social security number. Mikottis advised the FBI personnel who answered the call that he was presently at his address described above. At approximately 4:31PM, Mikottis' telephone number called the FBI Detroit main number and the user of the telephone made pounding noises and punched digits on the phone which appeared mimic morse code. At approximately 5:12PM, Mikottis called the FBI Detroit main number and identified himself by name and again demanded a USMC officer to come to his location. Mikottis then stated "I plan on killing the President. I planted bombs at the White House. I planted bombs all over Michigan." Mikottis then started making pounding noises mimicking morse code and again repeated that he planted bombs all over Michigan. All of these described telephone calls were recorded.

30.     Each of these described telephone calls reflected a caller ID of telephone number 231-373-7858.  FBI records also confirm that the digits Mikottis repeated after his name throughout these telephone calls are the last four digits of his Social Security number.

31.     On November 5, 2021, I contacted the Antrim County Sheriff's Office concerning Mikottis.  On that date, I was advised by Detective Brian Knight that Mikottis has been calling their central dispatch over the last several days and has been requesting a Marine officer to visit his residence within their county. Attempts to conduct a welfare check at the address where Mikottis was residing were unsuccessful, as Mikottis would not come to the door.  I was further informed that MSP Trooper Nicholas Reszka also attempted contact with Mikottis but was unsuccessful.

32.     On November 5, 2021, MSP Trooper Nicholas Reszka advised me that he spoke with C.O., who identified herself as the girlfriend of Mikottis.  C.O. left the trailer residence where she and Mikottis lived because he was having a mental episode.  Before she left, she threw a .22 caliber rifle that was at the residence out into the yard.  She did not know whether Mikottis retrieved the firearm, as she did not return to the residence and was staying with friends.  When Trooper Reszka attempted to make contact with Mikottis at the trailer residence, Mikottis would not come to the door, and Trooper Reszka heard what sounded like tapping noises mimicking morse code from inside the trailer.

33.     On November 5, 2021, I attempted to call Mikottis at his telephone number numerous times.  Most of the telephone calls were unanswered, however, two of the calls were answered by a male individual who immediately became vocally agitated and then terminated the calls. I recognized the voice of the individual to be the same individual who called the FBI Detroit main number described above.

34. On November 8, 2021, I interviewed C.O. C.O. stated she has lived with Mikottis for the last year in a trailer located at 3513 Scofield Road, East Jordan, Michigan. C.O. had been in a relationship with Mikottis since that summer. C.O. recently left the trailer because Mikottis had become mentally unstable. C.O. stated that Mikottis remained living in the trailer and was no longer taking her telephone calls. C.O. stated that Mikottis currently did not have any mode of transportation.

**November 9, 2021 Bomb Threat and Threat to Kill the POTUS**

35. On November 9, 2021, at approximately 12:40PM, a male caller using the same telephone number Mikottis was identified using for the calls above, 231-373-7858, telephoned the USMC barracks at 8th and I Streets in Washington, D.C. On the phone call, the male caller stated that he had planted a bomb in Washington, D.C. and was on his way to kill the President. This call prompted emergency response to that USMC facility that same day. Based on the pattern of prior calls with similar threats, and the use of the same telephone number, I believe that the caller was Mikottis, but I do not have a recording of the call to the 8th and I Street barracks for voice comparison.

36. On November 9, 2021, the U.S. Secret Service interviewed J.Y., a co-worker of Mikottis. J.Y. stated he has visited Mikottis for the last several days and visited with him again on this date at Mikottis' trailer in East Jordan, Michigan to provide Mikottis with food. J.Y. attempted to discuss getting Mikottis help but Mikottis was not amenable to such help.

37. On November 10, 2021, I interviewed C.O. in person. C.O. was permitted to listen to a portion of the telephone call made to the FBI Detroit main number at approximately 4:07PM, on November 5, 2021, from telephone number 231-373-7858. C.O. identified the male caller as Mikottis. C.O. further confirmed that Mikottis utilizes telephone number 231-373-

7858.  C.O. stated that she has moved out of the trailer temporarily due to Mikottis' mental behavior.  C.O. stated that Mikottis has one firearm on the premises, which she described as a .22 caliber rifle.  C.O. has attempted to put Mikottis in contact with mental health professionals, but he has not been amenable to speaking with anyone.

38.     On November 16, 2021, other FBI agents and I accompanied C.O. to the trailer residence located at 3513 Scofield Road, East Jordan, Michigan.  Mikottis had left the premises with J.Y. prior to our arrival to go to a store.  C.O. entered the trailer to retrieve personal belongings, including the .22 caliber rifle which was owned by C.O..  The trailer was in complete disarray with numerous items damaged and broken.  C.O. also discovered that her pet rabbit was dead in its cage.  C.O. removed some of her belongings and the rifle and departed the premises.

39.     On November 18, 2021, U.S. Secret Service Special Agents Austin Hunt and Trent Carithers, along with a representative from the Michigan Department of Health and Human Services – Adult Protective Services, made in-person contact with Mikottis at the trailer in East Jordan, Michigan.  During the visit, Mikottis was interviewed.  Mikottis admitted that he had called the FBI and Marine Corps Barracks in Washington, D.C., and he admitted he made bomb threats and threatened President Biden during the calls.  Mikottis apologized to the interviewing agents, and he stated he had no intentions or means to carry out any of the stated threats.  Mikottis declined services offered by the Adult Protective Service employee.

40.     Prior to his arrest, Mikottis utilized several Facebook profiles.  In one profile, using his true name, Mikottis posted images of text messages he had exchanged with other individuals in which he admitted to making several bomb threats.  Some of these messages were posted after the criminal complaint was filed.  These messages were posted as screen shots,

which I know from my training and experience are commonly created through the use of a wireless telephone.

41.     The Device is currently in storage at the FBI Traverse City Resident Agency office.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.

## TECHNICAL TERMS

42.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also

include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).

> Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.
>
> e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

43. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as wireless telephone, camera, and that it can be used to access the Internet through the use of applications. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

44. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

45. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

  a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

  b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

  c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

  d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

46. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

47. *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

48. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.